UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN A. SANTIAGO, | : |
| Plaintiff, | : |
| v. | : CASE NO. 3:06-CV-277 (RNC) |
| STATE OF CONNECTICUT, DEPT. OF MENTAL HEALTH AND ADDICTION SERVICES, | : |
| Defendant. | : |

RULING AND ORDER

Plaintiff brings this employment discrimination case against his former employer, the Connecticut Department of Mental Health and Addiction Services ("DMHAS"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., claiming that he was subjected to disparate treatment, harassment, and retaliation because he is male and Hispanic. The defendant has moved for summary judgment. For the reasons that follow, the motion is granted.

I. Summary Judgment

Summary judgment may be granted when "there is no genuine issue as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S, 242, 248 (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." Id. In determining whether a factual dispute presents a genuine issue of material fact, the record before the court must be viewed in a manner most favorable to the nonmoving party. The court must give credence to evidence favorable to the nonmoving party, and disregard evidence favorable to the moving party unless a reasonable jury would have to credit it. The court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150-51 (2000)(discussing identical standard governing motion for judgment as a matter of law under Rule 50).

II. Facts

The summary judgment record, viewed most favorably to the plaintiff, establishes the following facts. Plaintiff, a social worker, was employed by DMHAS from 1997 to 2006. Until mid-2002, he worked at the Connecticut Mental Health Center. He then applied for and was given a position at the Acute Substance Treatment Unit in Bridgeport. His supervisors there were Karin Rennert and Miriam Olack, both non-Hispanic females. On April 23, 2004, plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities (CHRO) against Rennert and Olack, alleging discrimination and retaliation. He also filed a grievance contesting a written warning he had received from Olack. The written warning was removed from his

personnel file after a full investigation.

Not long after he filed his CHRO complaint, plaintiff requested a transfer from the Acute Substance Treatment Unit. Defendant initially denied plaintiff's request, but transferred him to the Crisis Admissions Unit approximately two months later, after learning from several sources that his work environment was affecting his post traumatic stress disorder. Plaintiff remained in the Crisis Admissions Unit for approximately four months.

In August 2004, plaintiff was promoted to the position of Supervising Clinician of the Hispanic Unit ("H Unit") at the Greater Bridgeport Community Mental Health Center (GBCMHC). The H Unit provides clinical services to Spanish-speaking clients. All the staff members of the H Unit were Hispanic and, except for the plaintiff, all were women. Plaintiff's immediate supervisor, Dr. Ellen Nasper, is Caucasian.

As Supervising Clinician of the H Unit, plaintiff played an administrative role. He was expected to be well-informed about policies and procedures, listen to employee concerns in a collaborative manner, and help improve job performance. He was initially given a six-month probationary period, which was called a "working test period."

In November 2004, Dr. Nasper gave plaintiff his "Mid Working Test Evaluation." Using a standard evaluation form, she rated him "above average" or "average" in most areas but "below

average" in "cooperation" and "judgment."  In support of the latter ratings, Nasper wrote that she had significant concerns about the way plaintiff perceived his role as Supervising Clinician, that he used methods of communication with other employees demonstrating poor judgment, and that he had difficulty appreciating these concerns when they were explained to him. Plaintiff refused to sign the evaluation form.

At a staff meeting in December 2004, several H Unit staff members raised concerns about the plaintiff.  Two days later, six staff members sent a letter to Nasper detailing their concerns. They claimed that the plaintiff had subjected them to angry outbursts, disrespectful and harsh words, intimidating tactics, and inappropriate sexual language, making them fear for their safety.  Nasper responded to the staff members in writing that she planned to file a work rule violation report, which defendant requires employees to submit when they become aware of a policy violation.  Nasper informed the staff members that they would have to complete "witness statements."

Nasper spoke with the plaintiff about the staff members' complaint.  She then sent him a letter expressing her concern that he was not adequately performing several functions required of him as a supervisor.  She also filed a work rule violation report alleging that he had violated defendant's policies prohibiting verbal and sexual abuse.  The report went to

defendant's Human Resources Division as well as defendant's Affirmative Action Unit.

In January 2005, the Human Resources Division and the Affirmative Action Unit began parallel investigations of the allegations in the work violation report. Plaintiff was temporarily transferred from the H Unit pending the outcome of the investigations. During the reassignment, his salary, benefits, and title remained the same, but he did not have supervisory responsibilities. The Director of Human Resources subsequently sent plaintiff a letter advising him that his working test period would be extended for the duration of his temporary reassignment.

On January 11, 2005, plaintiff filed a second CHRO complaint. He alleged that Nasper's mid-term evaluation, the staff's allegations, and his transfer constituted retaliation for his prior CHRO complaint. He also alleged discrimination based on ethnicity and mental disability, a hostile work environment, and disparate treatment arising from his prior complaint and ongoing opposition to discrimination.

On March 17, 2005, the Human Resources Division issued a report of its investigation. The report stated that the staff's complaints were unsubstantiated, but documented problems with plaintiff's communication style. The report also found that all H unit staff members often engaged in inappropriate

5

conversations.  The report recommended that the entire team attend a refresher course on sexual harassment.  During the investigation, plaintiff had complained that Nasper's supervision of him was inadequate.  In light of this, the report recommended that plaintiff be supervised for a period of time by both Nasper and her supervisor, George Hagman.

On April 7, 2005, the Affirmative Action Unit issued a report based on its parallel investigation.  The report stated that plaintiff and H Unit staff members likely had violated defendant's policy statement on sexual harassment.  The report recommended that plaintiff stop engaging in conversations "of a sexual nature" in the workplace and that he attend Sexual Harassment Prevention Training for Supervisory Staff.  The report also recommended that other H Unit staff members stop engaging in inappropriate conversations and that all H Unit staff members, including plaintiff, participate in a refresher Sexual Harassment Prevention Training Workshop.

In April 2005, plaintiff returned to the H Unit.  At that time, his supervisors put into effect a new "supervisory plan" implementing Human Resources' recommendations.  Plaintiff's working test period was again extended, and Hagman agreed to act as a "back-up" supervisor.

Soon after plaintiff's return to the H Unit, staff members filed more complaints about his behavior.  A complaint by Clara

Hart alleged that he was intimidating and hostile. Alma Velasquez filed a sexual harassment complaint on behalf of another staff member, Maria Ovechka, alleging that plaintiff had pinched Ovechka's face. Another female staff member named Dennis Araujo alleged that plaintiff had thrown patient charts at her. Both Araujo and the plaintiff threatened to file opposing work rule violation reports regarding the incident. Araujo subsequently left the H Unit.

After the Araujo incident, plaintiff sent an e-mail to his supervisors complaining of a hostile work environment. Plaintiff stated that staff members were disobeying work requirements and that he refused to be the subject of any further misconduct investigations. On April 20, 2005, within just a few weeks of his return to the H Unit, he sent a letter to the Associate Director of the GBCMHC requesting a transfer on the ground that he was having difficulty re-establishing trust with H Unit personnel. Defendant took no action on plaintiff's request.

On December 2, 2005, plaintiff sent an e-mail to the Director of Human Resources complaining about staff member Clara Hart. Plaintiff had received information that Hart had spoken about him in an unprofessional manner to a former patient. Hart soon left the H Unit.

In April 2006, a clerk at the GBCMHC filed a work rule violation report accusing the plaintiff of having a personal

7

relationship with a former client in violation of defendant's policy prohibiting such relationships. Human Resources began an investigation. Later that month, defendant presented plaintiff with a proposed stipulation whereby he would retire from state service and the investigation would be closed. Plaintiff refused to sign the stipulation. On June 29, 2006, while the investigation was still pending, plaintiff submitted an application for voluntary retirement and subsequently left state service. The investigation of the allegation concerning his relationship with a former client was never completed.

III. Discussion

    A.   Disparate Treatment

Title VII makes it unlawful for an employer "to discriminate against any individual . . . because of . . . race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The framework used to evaluate a claim of disparate treatment is well-established. The plaintiff has the initial burden of presenting a prima facie case of discrimination. Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-253 (1981). This requires a showing that the plaintiff was subjected to an adverse employment action under circumstances giving rise to an inference of discrimination. Fitzgerald v. Henderson, 251 F.3d 345, 356 (2d Cir. 2001). An adverse employment action occurs when an employee suffers a "materially adverse change" in the terms and

conditions of his employment, such as a demotion or "significantly diminished" responsibilities. Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the differential treatment. Burdine, 450 U.S. at 253. The plaintiff then has an opportunity to prove by a preponderance of the evidence that the defendant's neutral explanation is a pretext for discrimination. Id. At all times, the Plaintiff bears the ultimate burden of proving that the defendant engaged in intentional discrimination. Id. In the summary judgment context, a plaintiff is required to put forth sufficient evidence to support a reasonable finding that the difference in treatment probably was motivated by discrimination. See Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000); Stern v. Columbia Univ., 131 F.3d 305, 310-12 (2d Cir. 1997); Holt v. KMI-Continental, Inc., 95 F.3d 123, 129 (2d Cir. 1996).

1. Constructive Discharge

Plaintiff's amended complaint asserts that defendant subjected him to a constructive discharge in violation of Title VII by forcing him to resign due to his gender. A constructive discharge occurs when an employer creates work conditions so intolerable that a reasonable person in the employee's position would feel compelled to resign. Ferraro v. Kellwood Co., 440

9

F.3d 96, 101 (2d Cir. 2006). A constructive discharge may qualify as an adverse employment action for the purpose of making a prima facie case of discrimination. See Fitzgerald, 251 F.3d at 357. However, even assuming plaintiff could prove that defendant forced him to resign, his claim fails because he presents insufficient evidence that the resignation occurred in circumstances supporting a reasonable inference of discrimination.

Plaintiff asserts that other employees violated the rule prohibiting personal relationships with clients and went undisciplined, but he provides no evidence to support a finding that other employees committed similar violations or that the defendant knew about the violations. See Shumway v. United Parcel Serv., Inc., 118 F.3d at 64-65 (2d Cir. 1997) (comparison to other employees insufficient to state prima facie case when there was no evidence employer knew about violations). Plaintiff also asserts that his alleged violation was reported because of his gender, but this assertion is wholly unsupported. Accordingly, the constructive discharge claim fails to withstand the motion for summary judgment.

2. Extension of Working Test Period

Plaintiff also complains that defendant subjected him to disparate treatment in violation of Title VII by extending his working test period for six months due to his gender. Defendant

contends that the extension does not constitute an adverse employment action for the purpose of a disparate treatment claim. I agree. Extending a probationary period can be considered an adverse employment action in some circumstances. See Thomas v. City of Beaverton, 379 F.3d 802, 812 (9th Cir. 2004). But plaintiff fails to articulate how the extension disrupted his employment and there is no evidence that it did. He successfully passed the extended probationary period and did not suffer any loss of salary, benefits, or advancement opportunities as a result of the extension. See Galabya, 202 F.3d at 640.

Plaintiff's disparate treatment claim based on the extension also fails at the third step of the burden-shifting analysis. Defendant states that it extended plaintiff's probationary period because it could not adequately assess his supervisory abilities while he was temporarily transferred pending the outcome of the investigations of the staff's allegations. Plaintiff responds that two other supervising clinicians' working test periods were not extended. It is undisputed, however, that neither of them was the subject of a complaint leading to a transfer during the probationary period. Defendant faced potential liability to the staff members in the H unit if it failed to investigate the allegations against plaintiff. See, e.g., Faragher v. City of Boca Raton, 524 U.S. 775, 788-789 (1998); Richardson v. New York State Dept. of Correctional Service, 180 F.3d 426, 441 (2d Cir.

1999) *abrogated on other grounds by* Swierkiewicz v. Sorema N.A, 534 U.S. 506 (2002).[1]

Because plaintiff has failed to show that he suffered an adverse employment action under circumstances giving rise to an inference of discrimination, his disparate-treatment claim is properly dismissed.

    B.    Hostile Work Environment

Plaintiff claims that he was subjected to a campaign of harassment and intimidation amounting to a hostile work environment. He alleges that his supervisors created this environment by persistently giving him unfounded warnings, referring to him as intimidating, violent and dangerous, supervising him in contravention of defendant's policies, filing work rule violation reports, removing him from his supervisory responsibilities and ignoring his transfer request. He cites the following incidents:

    (1) Olack said he had a personality disorder and called him a "loose cannon" during a meeting;

    (2) Olack and Rennert gave him a negative employment evaluation;

    (3) Olack threatened to terminate him at least twice;

---

[1] Plaintiff asserts that the complaints against him were "blatantly false" and should have been recognized as such, but he points to no evidence in the record that would permit a reasonable jury to make such findings.

(4) Olack gave him a written warning and filed a work rule violation against him alleging violations of law and ethics;

(5) Rennert filed a work rule violation against him for misuse of leave time;

(6) Rennert and Olack supervised him although they were not licensed clinical social workers of a higher grade, in violation of defendant's policies;

(7) Nasper filed the work rule violation against him on behalf of others without having witnessed the work rule violation firsthand;

(8) Nasper asked plaintiff to attend training sessions on management skills and emotional intelligence before the investigations of her work rule violation report were completed;

(9) plaintiff's request to transfer out of the H Unit was ignored;

(10) plaintiff was required to attend sexual harassment training on multiple occasions; and

(11) plaintiff was improperly subjected to "dual supervision."

To prevail on his hostile work environment claim, plaintiff must prove that the workplace was "permeated with discriminatory intimidation, ridicule and insult" and that this was "sufficiently severe or pervasive to alter the conditions of [his] employment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570

(2d Cir. 2000). Whether he can satisfy this requirement depends on the totality of circumstances, including the severity, frequency and degree of the abuse. See Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002). Generally, in order to be sufficiently severe or pervasive, incidents of harassment must be continuous and concerted. Id. To establish a gender- or race-based hostile work environment claim, moreover, plaintiff must prove that the conduct occurred "because of [his] sex" or race. Id. Facially neutral incidents must be excluded from consideration unless a reasonable fact-finder could conclude that they were, in fact, based on sex. See id. at 380.

A reasonable factfinder could not conclude that the incidents plaintiff uses to support his hostile work environment claim were based on sex or race. The numerous incidents he cites are facially neutral with the possible exception of the requirement that he attend sexual harassment training. Plaintiff asserts that he was forced to repeatedly attend sexual harassment training because of his "maleness." It is undisputed, however, that the female staff members in the H Unit had to attend sexual harassment training, not just the plaintiff, and that the plaintiff was required to attend additional training for supervisory staff because of his position as a supervisor.

Plaintiff contends that evidence of discrimination may be found in "code words" his supervisors used about him, including

14

"violent," "PTSD," "loose cannon" and "intimidating." These "code words" provide an insufficient basis for a reasonable inference that the incidents were motivated by discriminatory intent. Though stereotyped remarks can sometimes be used as evidence of discrimination, see Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 119-120 (2d Cir. 2004), not all language with sex- or race-based connotations is automatically discrimination. McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1117 (9th Cir. 2004)(quoting Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996))("code words" create hostile work environment only when they "send a clear message" or "carry the distinct tone" of illegal discriminatory intent). Even words with sexual content or connotations must be directed at a person "because of . . . sex" to violate Title VII. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). See also Spearman v. Ford Motor Co., 231 F.3d 1080, 1085 (7th Cir. 2000)(hostile work environment claim failed because stereotypical remarks were directed at plaintiff because of work-related conflicts rather than his sex).

No discriminatory intent can be inferred from the allegedly stereotypical language plaintiff claims was used against him. First, it is not clear that plaintiff's "code words" actually refer to stereotypically male characteristics. Women can be violent and intimidating and suffer from PTSD. Even assuming

15

these words connote male characteristics, plaintiff has not shown they were directed at him because of his gender. Plaintiff admits that he suffered from PTSD. Nasper explains that she found plaintiff intimidating because he had slammed his hands on a table and shoved himself away from the table, behavior that could also be described as "violent" or characteristic of a "loose cannon." Plaintiff does not deny that he behaved this way, nor does he suggest that defendant's explanations are pretextual.

The Second Circuit has sanctioned an "informal approach" to determining whether harassment invoking a gender stereotype occurred "because of sex," including asking whether plaintiff's traits would have been questioned if he belonged to the opposite gender. See Back, 365 F.3d at 120, n.10 (citing approvingly Doe ex rel. Doe v. City of Belleville, 119 F.3d 563, 581-82 (7th Cir. 1997)). Behavior such as shoving chairs and slamming hands on a table would be described as 'violent' or 'intimidating,' whether exhibited by a male or a female. Given that plaintiff has presented one arguably sexually-motivated incident and a number of facially neutral incidents with no indication that the incidents occurred because of his gender, his claim of hostile work environment must fail.[2]

---

[2] Even if plaintiff could prove that the incidents were motivated by his gender, it is doubtful that the incidents he
(continued...)

C. <u>Retaliation</u>

Plaintiff alleges that defendant's employees retaliated against him because he filed CHRO complaints. Claims for retaliation are analyzed using the same three-part burden-shifting framework as other Title VII claims. See <u>Treglia v. Town of Manlius</u>, 313 F.3d 713, 719 (2d Cir. 2002). Plaintiff may make a prima facie showing of retaliation by demonstrating his participation in a protected activity, an employment action disadvantaging him, and a causal connection between the protected activity and the adverse employment action. <u>Van Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708, 714 (2d Cir. 1996). The burden then shifts to the defendant to offer legitimate reasons for its actions, after which the plaintiff bears the burden of proving that the proffered explanation is merely a pretext for retaliation. <u>Id</u>.

In support of his retaliation claim, plaintiff points to the "mediocre" evaluation he received from Nasper, the work rule violation Nasper filed against him, and the "double supervision" he received from Nasper and Hagman. Plaintiff asserts that these actions were taken in retaliation for his filing a complaint with the Office of Multicultural Affairs regarding the paucity of men

---

[2](...continued)
complains about were sufficiently severe or pervasive to meet the threshold for a hostile work environment. See <u>Alfano v. Costello</u>, 294 F.3d 365, 379 (2d Cir. 2002)(collecting cases).

17

in the H Unit.  Defendant states that Nasper provided the mediocre evaluation because she regarded plaintiff as "below average" in exercising cooperation and judgment, that she filed the work rule violation report because all employees were obligated to report a possible violation when it came to their attention, and that the "double supervision" plaintiff received constituted an attempt to address his own complaints about Nasper's supervision.  Plaintiff responds that Nasper had no reason to give him a poor evaluation unless she was retaliating, and that no one else was subjected to "double supervision."  Plaintiff's conclusory response is insufficient to prove that defendant's explanation is pretextual.  Accordingly, his retaliation claim is properly dismissed.  See Dawson, 373 F.3d at 272.

IV. Conclusion

For the foregoing reasons, defendant's motion for summary judgment is hereby granted.  The Clerk may close the file.

So ordered this 30th day of September 2008.

/s/ RNC
Robert N. Chatigny
United States District Judge